# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

KEVIN D. CLARK,                              )
                                             )
      Petitioner,                     )
                                             )
v.                                           )          NO. 2:18-cv-00103
                                             )
TONY MAYS, Warden,                           )
                                             )
      Respondent.                     )

## MEMORANDUM OPINION

Kevin D. Clark, an inmate at the Riverbend Maximum Security Institution in Nashville, Tennessee, is serving life in prison based on his 2012 conviction by an Overton County, Tennessee jury of charges including two counts of first-degree premeditated murder. On December 10, 2018, Petitioner filed a pro se Petition for the Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 1), challenging the constitutionality of his state conviction. Respondent filed an Answer to the Petition (Doc. No. 16) and the state court record (Doc. Nos. 14, 15). Petitioner subsequently filed a motion to expand the record, which the Court denied on February 14, 2020. (Doc. Nos. 25, 26). Then, with Respondent's consent and the permission of the Court, Petitioner's Amended Petition (Doc. No. 27) was filed for the limited purpose of clarifying and supporting the claims of his original Petition. (See Doc. No. 25 at 9–10).

This matter is ripe for the Court's review, and the Court has jurisdiction. Respondent does not dispute that the Petition is timely and that this is Petitioner's first Section 2254 petition related to this conviction. (Doc. No. 16 at 1). Having reviewed Petitioner's arguments and the underlying record, the Court finds that an evidentiary hearing is not required. As explained below, Petitioner is not entitled to relief under Section 2254, and his Petition will therefore be denied.

# I. PROCEDURAL HISTORY

In February 2010, an Overton County grand jury charged Petitioner with two alternative counts of first-degree premeditated murder and first-degree felony murder, one count of aggravated arson, one count of abuse of a corpse, one count of attempted first-degree murder, and two counts of aggravated assault. (Doc. No. 14-1 at 6–8). At trial, Petitioner was convicted as charged, except that the attempted first-degree murder charge resulted in conviction of the lesser-included offense of reckless endangerment. (Doc. No. 14-2 at 60–68). The trial court subsequently merged the felony murder convictions into the premeditated murder convictions and imposed consecutive life sentences, with concurrent sentences for the remaining convictions. (Id. at 90–98).

The Tennessee Court of Criminal Appeals affirmed the trial court's judgment on direct appeal. State v. Clark, No. M2012-01744-CCA-R3CD, 2013 WL 6145812 (Tenn. Crim. App. Nov. 21, 2013); (Doc. No. 14-15). The Tennessee Supreme Court denied discretionary review on April 8, 2014. (Doc. No. 14-19).

Petitioner subsequently filed a pro se petition for post-conviction relief in the trial court, which was amended after counsel was appointed. (Doc. No. 14-20 at 3–9, 25–147; Doc. No. 14-21 at 27–38). After holding an evidentiary hearing (Doc. No. 14-22), the post-conviction trial court denied relief on August 25, 2017. (Doc. No. 14-21 at 43–51).

On June 19, 2018, the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. Clark v. State, No. M2017-00755-CCA-R3-PC, 2018 WL 3045686 (Tenn. Crim. App. June 19, 2018); (Doc. No. 14-26). Petitioner filed for permission to appeal to the Tennessee Supreme Court, which was denied on October 10, 2018. (Doc. No. 14-30). Petitioner then filed his pro se petition under Section 2254 in this Court.

2

## II. STATEMENT OF FACTS

A. <u>Trial Proceedings</u>

Petitioner's ex-wife, Susan Clark, testified that, in May 2009, she and Petitioner lived in a house on property that adjoined the property of Petitioner's mother, Vida Clark. <u>State v. Clark</u>, 2013 WL 6145812, at *1. Petitioner's older brother, Jerry Clark, testified that he had sold Petitioner his property while Vida Clark lived with their younger brother, Roy Clark, in the house next door. <u>Id.</u> at *2. The two properties utilized a common driveway, and the home shared by Petitioner and Susan Clark was not accessible by any other driveway. <u>Id.</u> at *1.

Susan Clark testified that when she returned home from work at approximately 5:30 p.m. on May 12, 2009, "there was a fence across the driveway that had yellow bags on it," preventing her from accessing the portion of the driveway that led to her home. <u>Id.</u> She was forced to "drive up a field" to get to her house, and nearly damaged her car in the process. <u>Id.</u> When Susan Clark arrived at her house, Petitioner was there but asleep, because he was at that time working third shift. Susan did not wake him immediately, but waited until 9:00 p.m., Petitioner's normal time to wake for work, before telling him about the fence blocking their driveway access. Petitioner responded to this news by saying, "'You're kidding,'" and by telephoning his older brother Jerry. <u>Id.</u> After his conversation with Jerry ended, Petitioner stated to Susan, "'I can't worry about it. I've got to go to work.'" <u>Id.</u> Susan testified that Petitioner was not at that time angry or upset, but that he "just seemed real puzzled." <u>Id.</u>

When Petitioner returned home from work the following morning, May 13, 2009, he told Susan that "he needed to mow a neighbor's yard before the rain and that he could not 'deal with this today.'" <u>Id.</u> Susan told him "that they could discuss the matter of the fence with her brother, an attorney, when she finished her shift at work." <u>Id.</u> Petitioner agreed, and Susan left for work.

3

However, Petitioner "telephoned her at 6:35 a.m., and said he was 'not in his right self.'" Id. He told Susan, "It's been took care of," that he had "called the fire department and the police department," but that "[t]hey're not going to take me alive." Id. Susan testified that she was terrified by Petitioner's statements and telephoned Jerry, but that Jerry "said he didn't want to go up there," so Susan called Petitioner's friend, Kevin Phillips, and asked him to investigate. Id. Susan testified that Petitioner had not previously threatened Roy and Vida Clark. Id. at *2.

Jerry Clark testified that Petitioner had lived next door to their mother, Vida Clark, for eight to ten years. Id. When Petitioner called him to tell him that Vida and Roy had placed a fence across the driveway, Jerry twice "suggested that [Petitioner] complete a driveway that he had started to build on another part of the property to avoid trouble," but Petitioner stated that he should be able to use the existing driveway and that he intended to hire a lawyer, to which Jerry responded, "Well, do whatever you need to do." Id. Petitioner stated, "I believe I'm just going to take care of this myself." Id.

Jerry testified that he went to his mother's house the following morning after receiving Susan's frantic phone call, and that when he arrived, he saw the house in flames and his mother lying in the driveway. He "said that no one else was around, so he '[k]indly got [him]self out of sight' until emergency personnel arrived." Id. Jerry further testified on cross-examination that the alternate driveway he had suggested Petitioner use was not completed and would not have been passable in the rain. He also confirmed that he had sued Petitioner for a million dollars in his capacity as executor of his mother's estate. Id.

After Petitioner's family members testified, "[t]he video-recorded deposition of State witness William Brockette and an accompanying transcript were tendered as exhibits over [Petitioner's] objection," id., containing the following testimony:

4

In the deposition, Mr. Brockette testified that he had worked with [Petitioner] on the third shift sanitation crew at the Perdue Farms chicken processing plant in Monterrey. On May 12, 2009, [Petitioner] told Mr. Brockette about an altercation with [Petitioner's] brother "about a fence [that] had been put up across the driveway." [Petitioner] told Mr. Brockette that "if that fence was still up when he got off work that morning and went home, that he was going to kill him." Mr. Brockette said that he did not take the threat seriously, believing [Petitioner] was "just blowing off some steam." He said that [Petitioner] was "very frustrated" about the fence. Mr. Brockette said that he told [Petitioner] to telephone an attorney to deal with the situation and provided him with the name of an attorney. [Petitioner] told Mr. Brockette that "it just burns him up . . . how his brother acts." According to Mr. Brockette, [Petitioner] said that his mother had "always taken up for Roy, and Roy . . . can't do anything wrong, and she's always got excuses for things that he does." Mr. Brockette said that "[i]t seems like there was a . . . lot of frustration from past years, you know, that had boiled up to . . . what happened." Eventually, the men began to work, and [Petitioner] did not mention the fence again. Mr. Brockette remembered that [Petitioner] left before 5:00 a.m. on the following morning, explaining that [Petitioner] had intended to buy a weed-eater from Mr. Brockette but forgot the weed-eater in Mr. Brockette's truck. Mr. Brockette said that when he saw that the weed-eater was still in his truck, he tried to call [Petitioner], but [Petitioner] did not answer.

Id.

Petitioner's neighbors, Jewel Belle Melton and Paul Walker, testified to what occurred at Vida Clark's property on the morning of May 13, 2009. Just prior to the fire at that property, Melton had received a telephone call from Petitioner in which he asked Melton whether she knew that the fence had been placed across the driveway. Id. at *3. "She said that she told him that she did and said that Vida Clark had told her about the fence. She testified that [Petitioner] said, 'God bless you,' and hung up the phone." Id. Shortly thereafter, Melton was on her front porch and witnessed Vida Clark's house "go shebang." Id. Paul Walker testified that, at approximately 6:30 or 7:00 a.m., he was awakened by gunshots that sounded as though they had come from Vida Clark's residence. Id. Walker then telephoned another neighbor, who had not heard the gunshots. After hearing additional gunshots, Walker went to his window and saw smoke coming from Vida Clark's residence. Id.

The audio recording of a 911 call made by Vida Clark that morning was played for the jury. (Doc. No. 14-4 at 177). During that call, Vida Clark reported that her son had come to her residence and shot "both" residents, telling the 911 operator that her arm had been "about blowed off." State v. Clark, 2013 WL 6145812, at *3. The 911 operator testified that Vida Clark did not make any further sound after this statement, and that law enforcement was dispatched to the scene. Id.

The responding officers, Sergeant Robert Garrett and Deputies Derrick Ledbetter and John Mackey of the Overton County Sheriff's Department, responded to the emergency call from Vida Clark. Id. They testified to the following:

> Parking several hundred yards away from the residence due to the nature of the call, the officers used tree cover as they made their approach to the house because they had been advised that the shooter was still on the scene. Sergeant Garrett testified that as they approached the house, he encountered some individuals who told him there was a body near the house. Sergeant Garrett observed the body lying three or four feet from the house, and after clearing the area, he and Deputy Ledbetter dragged the body away from the flames. He said that the house was fully engulfed in flames.
>
> After setting up a perimeter and waiting for other officers, Sergeant Garrett and those officers made their approach toward [Petitioner's] house. As they approached, they saw [Petitioner] standing in the doorway of his back porch with a camouflage colored rifle in his hand. [Petitioner], who appeared to be wearing a field jacket, ordered the officers to fall back. They initially fell back but then took another path toward [Petitioner's] house. Sergeant Garrett recalled that as he began to cross a fence, he heard "what sounded like two .22 shots." Deputy Ledbetter "came across and was turning to cover for" Deputy John Mackey when Sergeant Garrett heard a "louder boom, that came from a larger caliber." At that point, Deputy Ledbetter "grabbed his shoulder and hit the ground and said, 'I've been hit.'" Sergeant Garrett removed Deputy Ledbetter's shirt and examined his chest underneath the ballistics vest and observed "a large amount of redness on his shoulder area."
>
> Sergeant Garrett testified that after a period of negotiating with his pastor, Petitioner surrendered and "was apprehended peacefully." When officers entered [Petitioner's] house, they observed "a small kitchen-like table, and it had two guns on it pointing out the window." Officers observed a camouflage jacket on the floor.

6

Deputies Mackey and Ledbetter confirmed Sergeant Garrett's recitation of the day's events.

Id. at *3–4.

Agent Greg Whittaker of the State of Tennessee Bomb and Arson Unit investigated the scene and testified that "numerous shotgun shells [were] located on the outside of the [Vida Clark] residence," that the bodies of a human and a dog were found in the kitchen area of the severely burned home, and that "'an unusual burn pattern on the exterior of the residence' was consistent with the use of an accelerant to start the fire." Id. at *4. He further testified that officers investigating Petitioner's residence recovered "gasoline found in some quart jars, along with some foam-type products commonly associated with maybe some type of incendiary device itself." Id. Agent Whitaker concluded that Vida Clark's residence burned as a result of "an incendiary fire," and that the fire could not have started at its point of origin by any source "other than [by] being set." Id.

Tennessee Bureau of Investigation (TBI) Agent Steve Huntly assisted the investigation of the crime scene and also collected physical evidence for testing, including a Ruger 10/22 and Winchester pump-action 12-gauge shotgun from Petitioner's residence; Petitioner's jacket with "shot shells" and one slug in the pocket; the same shotgun pellets that the medical examiner recovered from Vida Clark's arm and Roy Clark's abdomen; and Petitioner's clothing and boots from the jail. Id. Forensic examination of shotgun shells recovered from the crime scene revealed that the shells had been fired from the 12-gauge shotgun recovered from Petitioner's residence. Id. Other ballistic and forensic expert testimony was given at Petitioner's trial, as follows:

> TBI Agent and Firearms Identification Expert Steve Scott testified that he examined a 12-gauge shotgun and a .22-caliber rifle taken from [Petitioner's] residence as well as a number of "shotshell" cases and .22-caliber cartridge cases. He said that the birdshot pellets obtained from the victims at autopsy were "consistent, or within the size and weight specifications of" those shotshells he determined had been fired

7

by the 12-gauge shotgun. He also examined a window screen and determined that a hole in the screen was caused by a shotgun blast with the muzzle of the gun aimed less than five feet away from the screen.

TBI Special Agent and Forensic Scientist Randall Curt Nelson testified that he analyzed three vials of liquid obtained from [Petitioner's] residence and determined them to be "gasoline-range products." Forensic analysis of [Petitioner's] jacket, boots, and clothing "revealed the presence of an evaporated gasoline-range product." Testing also revealed the presence of an evaporated gasoline-range product on a piece of pipe foam taken from [Petitioner's] residence. During cross-examination, Agent Nelson admitted that he could not quantify the amount of the substance that was on any of the items.

TBI Special Agent and Forensic Scientist Robert T. Miles, III, testified that he examined [Petitioner's] jacket, boots, and clothing for the presence of gunshot residue. He found the residue on all three items.

Id. at *5.

Finally, Dr. Thomas Deering, the forensic pathologist who performed the autopsies of Vida and Roy Clark, testified that the cause of Roy Clark's death was a shotgun wound to the abdomen, specifically his back left flank. Id. Dr. Deering testified that, though Roy Clark's body was severely burned, the absence of soot from his airways and the level of carbon monoxide in his blood demonstrated that he was not alive during the fire. Id. Dr. Deering further testified that Vida Clark had shotgun entrance wounds to the back of the left side of her neck and the back of her left arm. Id. at *6. As to Vida Clark's cause of death, Dr. Deering "characterized the wound to [her] neck as lethal," and stated "that it would have been impossible for Vida Clark to call 9-1-1 after suffering that wound because it nearly severed her spinal cord and did sever the left vertebral artery as well as fracture her jaw, break her teeth, and seriously injure her lips and tongue." Id. He testified that Vida "would have fallen immediately after being shot and would not have been able to move," and that the level of carbon monoxide in her blood "indicat[ed] that she lived long enough to breathe the smoke from her burning home." Id.

The defense did not put on any proof after the State rested its case. The jury proceeded to convict Petitioner of the first-degree premeditated murders of his mother, Vida Clark, and his brother, Roy Clark; the felony murder of Vida Clark in the perpetration of Roy Clark's murder, and in the perpetration of burglary, aggravated arson, and abuse of a corpse (these convictions were subsequently merged into the conviction for the first-degree murder of Vida Clark); the aggravated assault of Deputy Mackey; the aggravated assault of Sergeant Garrett; and the lesser included offense of reckless endangerment on the count charging the attempted first-degree murder of Deputy Ledbetter. Id. The first-degree murder convictions carried automatic life sentences, which the trial court ordered to be served consecutively. Petitioner's remaining sentences were ordered to be served concurrently with the consecutive life sentences. Id.

B. Post-Conviction Proceedings

The following summary of the testimony at the post-conviction evidentiary hearing, as relevant to the issues raised in this habeas action, is taken from the opinion of the Tennessee Court of Criminal Appeals affirming the denial of post-conviction relief (Doc. No. 14-26):

> Mr. Brockette [testified] that the substance of his trial testimony was that he had heard the Petitioner say that if the gate wasn't moved he was going to kill someone. Mr. Brockette said that he did not believe at the time that the Petitioner intended to kill anyone. . . .
>
> Paul Walker testified that he lived near the scene of these killings, and he gave a statement to law enforcement regarding what he had seen. Mr. Walker said that he told law enforcement that there had been a long-running feud between the Petitioner and his brother, Roy Clark. He also told them, that on the day of these events, he heard what sounded like the Petitioner and Mr. Clark yelling at one another, but he could not be sure it was them because he did not recognize their voices.
>
> After having his recollection refreshed, Mr. Walker testified that he had told law enforcement that the Petitioner told him that he had not spoken with Mr. Clark for the last year. He further told law enforcement that, during the altercation, it sounded like Mr. Clark told the Petitioner to "come over here."

9

Mr. Walker said that, during the trial, the State's attorney asked him if there was friction between the two brothers, and he responded, "No." He explained that he was not asked about the yelling that he had heard.

During cross-examination, Mr. Walker said that after he testified[,] he left the trial. Mr. Walker said that he responded "No" to the friction question because, until the day of the shooting, he had not heard any arguments between the two men. He only heard them argue the morning of the shooting, so he felt he answered the question posed honestly.

Susan Clark testified that she was married to the Petitioner at the time of these events. She said that, during the trial, she was not asked about any changes to the Petitioner's work schedule or medication before these killings. She said that, had she been asked, she would have testified that his work schedule had changed to third shift and that he was taking medication for "panic anxiety" and "depression anxiety." Ms. Clark said that she thought that the Petitioner was taking his medication as prescribed but then he started having changes in his personality, such as forgetfulness. She then learned that he had not been taking his medication as prescribed. She took him to the doctor, who switched his medicine to the "opposite of what he was taking . . . before," and it "really messed with him."

Ms. Clark said she could have testified to these facts during the trial and that she had discussed these facts with the Petitioner's attorney.

During cross-examination, Ms. Clark testified that the Petitioner's attorney had an investigator come and take pictures of the house. She agreed that there was a photograph of the fence at issue that was introduced to the jury. Ms. Clark said she recalled an incident prior to this when the Petitioner shot repeatedly at her car. She explained that the Petitioner was using the car for target practice because it was going to be sold for scrap.

During redirect examination, Ms. Clark testified that the Petitioner's shooting of the car was not a violent incident.

[Trial] [c]ounsel testified that he was an assistant public defender and was not originally appointed to represent the Petitioner but that he took the case over after the preliminary hearing and represented the Petitioner during this trial and on appeal. He said that, at the time of trial, he had been a practicing attorney for thirteen years and that he had represented other clients facing homicide charges. Counsel recalled that this was his initial first degree murder trial as lead counsel but that he had acted as second chair in other criminal trials.

Counsel recounted how he prepared for upcoming trials, including his investigation methods. Counsel said that he received discovery in this case and, as he did so, he would meet with the Petitioner to review it. Another very experienced lawyer from

his office offered to sit second chair at this trial. Counsel said he filed close to twenty-four motions.

Counsel said that after reviewing all of the evidence, he felt that the State's case was "[s]trong." His investigation revealed no other possible defendant who could have committed the killings or shot at the police officers who responded to the scene. Therefore, Counsel developed a trial strategy based upon attacking the mens rea for the intent at the time of the shootings. He said that there was not a lot of evidence that the Petitioner planned the shooting. Counsel sought to convince the jury that the Petitioner was guilty of a lesser-included offense. Counsel stated that the strategy was somewhat successful in that the Petitioner was convicted of a lesser-included offense with regard to Officer Ledbetter.

Counsel testified that the investigation did not reveal any helpful witnesses. The Petitioner requested that several witnesses be subpoenaed. Counsel subpoenaed those witnesses but, after speaking with the four that appeared at trial, he determined that none of them would have provided any material assistance. Counsel said that the Petitioner had hoped these witnesses would testify that Roy Clark was aggressive or violent, but Counsel found the contrary to be true.

. . . Counsel said that he did admit to the jury that the Petitioner had shot his brother, his mother, and the officer. He said that it was his belief that there was overwhelming proof of this. He hoped to gain the jury's trust in order to successfully argue that the Petitioner did not act with premeditation. Counsel reiterated that, after a thorough investigation, there was no proof that the Petitioner was not guilty of committing the killings.

Counsel testified that he requested and received funding to have the Petitioner mentally evaluated by Dr. Seidner. Counsel said that he provided Dr. Seidner with the Petitioner's medications, medical history, educational history, and mental history. The testing results would not have helped the Petitioner at trial. Dr. Seidner's findings were "pretty blunt and definitive," so Counsel did not seek a second evaluation.

Counsel said that he recalled Ms. Clark testifying about the Petitioner's change in behavior and her statements that he was not acting normally. He did not recall her specifically mentioning anything about the Petitioner's medications. She may have mentioned his changing work schedule, but Counsel did not recall. Counsel said that he had no information at the time that the Petitioner could possibly pursue an involuntary intoxication defense, and he did not believe that Dr. Seidner had this information either.

Counsel testified that he investigated whether there was a possible self-defense argument. He said that the investigation revealed some information that would have been helpful to the Petitioner, but he thought it would not be admissible. Counsel recalled looking into the Petitioner's allegations that Mr. Clark had substance abuse

issues, and he found some evidence supporting this claim. He decided that whether Mr. Clark used or sold drugs was not evidence that would have been admissible under the rules of evidence.

Counsel said that he advised the Petitioner not to testify and that the Petitioner agreed with this advice. He said that they and the second chair counsel discussed this decision at length.

During cross-examination, Counsel stated . . . that Mr. Brockette testified by video tape and that he cross-examined him during the recording. Counsel's goal was to attempt to minimize the incriminating statements that the Petitioner made to Mr. Brockette.

Counsel explained that he did not cross-examine Mr. Brockette about the Defendant's character because he would have opened the door to the admission of evidence regarding the Defendant's poor character. He said that the shooting of the car itself was not an issue because the car was being used for target practice, but it was the relation of the car to the crime scene that would have been damaging. Further, one of the witnesses that the Petitioner requested be subpoenaed told Counsel that Mr. Clark was not the violent brother but that the Petitioner was the violent one. The witness additionally told Counsel that the Petitioner had harassed him and his family and had even exposed himself to them on one occasion. In fact, every witness that the Petitioner asked to be subpoenaed said that they were not going to help the Petitioner and that they could only hurt the case.

Counsel said he did not ask the witness Paul Walker about whether there had been a long-standing feud between Mr. Clark and the Petitioner because he did not think that doing so would be a good trial strategy. Counsel said that evidence of a long-standing feud would have hurt his strategy to argue that the Petitioner did not have the requisite mens rea for first degree murder. Counsel further noted that he did not want to focus on the fence, in part because it seemed to be a petty thing to trigger such a catastrophic event.

Counsel testified that the attorney who sat second chair and helped him with the trial had more than twenty years of experience and had experience with criminal homicide trials. Further, Counsel said that he himself had extensive experience and that he had achieved some successes in his career. He said that he also preserved issues that he thought might be appealable [ ]. One such issue was the "Brockette deposition" issue. Counsel said that he objected to the admission of this deposition both in writing and before the trial court and that he also made it part of his motion for a new trial. Counsel said that he then appealed the issue and filed a writ of certiorari in the Tennessee Supreme Court, which was denied.

Counsel reiterated that he filed approximately twenty-four motions, some of which were successful. Counsel said that he met with the Petitioner "a lot" both at court appearances and at the jail. During their meetings, the Petitioner asked questions,

the two discussed types of defense theories, and the Petitioner appeared to understand their trial strategy. Counsel gave the Petitioner a copy of anything that he received related to the trial. Counsel felt the Petitioner was able to engage in the active defense of his case.

Counsel testified that he went to the crime scene in this case and that he examined the physical evidence. After speaking with the investigator[,] he was sure that the Petitioner's only viable defense was negating the mens rea. He reiterated that, given the evidence, it was going to be difficult to be successful with this defense, but Counsel felt it was their only option. Counsel agreed that the evidence included that the Petitioner was calm after the homicides, that there were numerous gun shells around the victims' home, that gunshots could be heard in the background of the 911 call, and that the Petitioner expressed his intention to take care of the problem to both his wife and a co-worker before the homicides. There was also evidence that the Defendant was in possession of incendiary devices and his clothing tested positive for gasoline and gunshot residue. There was also some burn splatter that was consistent with a Molotov cocktail, and police found Molotov cocktails in the Petitioner's residence.

Counsel said that, after Dr. Seidner evaluated the Petitioner, he gave Counsel his opinion. Counsel said that, in essence, Dr. Seidner said that "sometimes people get pissed off and kill other people" and that such was the case with the Petitioner. Counsel asked Dr. Seidner not to put his opinion in writing, and then he relayed this information to the Petitioner.

Counsel said that he did not hire an independent fire expert based upon his own investigation and his conversations with the Petitioner. About voir dire, he said that the Petitioner participated fully and asked to strike several potential jurors.

Counsel said that the Petitioner never indicated to him that Mr. Clark was shooting at him during these events.

Michael Hartung testified that he was formerly married to the Petitioner's sister, and he knew both the Petitioner and Mr. Clark. Mr. Clark assisted him in building their home. Mr. Hartung testified that he and Mr. Clark had a good relationship. However, Mr. Clark called him at work several times threatening him. Mr. Clark told Mr. Hartung that he had better treat Mr. Clark's sister right and then threatened to "whoop [his] ass" if he did not. Mr. Hartung said he told his wife about this and said that Mr. Clark seemed to be doing this after drinking. Mr. Hartung recalled that Mr. Clark would get "real intoxicated and sometimes he would, you know, be on pills and stuff. . . ." This behavior escalated to a point where Mr. Hartung became "really concerned." Mr. Hartung said that he did not testify at the Petitioner's trial and that, if he had been called, his testimony would have been consistent with this post-conviction testimony.

13

During cross-examination, Mr. Hartung testified that he met the Petitioner two or three times. The Petitioner came to his house and tried to get Mr. Hartung and his wife to go to church. Mr. Hartung agreed he was not present at the time the shooting occurred.

Clark v. State, 2018 WL 3045686, at *6–10.

## III. CLAIMS PRESENTED FOR REVIEW

The pro se Petition in this Court asserts the following claims:

(1) The trial court's admission of William Brockette's video deposition over Petitioner's objection violated his constitutional right to confront the witnesses against him.

(2) The evidence at trial was insufficient to support Petitioner's conviction for premeditated, first-degree murder.

(3) Trial counsel provided ineffective assistance by failing to pursue evidence supporting the defense theory that the killings were not premeditated.

(4) Counsel on appeal provided ineffective assistance by failing to argue cumulative error by the trial court, and by inadequately briefing the issue of the sufficiency of the evidence.

(Doc. No. 1 at 4–17; Doc. No. 27).

## IV. LEGAL STANDARD

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Peterson v. Warren, 311 F. App'x 798, 803–04 (6th Cir. 2009).

14

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. Id. at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. Id. at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007) (quoting Section 2254(d)(2) and (e)(1)); but see McMullan v. Booker, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read Matthews to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Richter, 562 U.S. at 102, and Woodford v.

Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner bears the burden of proof.
Pinholster, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who
have fully exhausted their remedies in the state court system. A federal court may not grant a writ
of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has
presented the same claim sought to be redressed in a federal habeas court to the state courts.
Pinholster, 563 U.S. at 182; Kelly v. Lazaroff, 846 F.3d 819, 828 (6th Cir. 2017) (quoting Wagner
v. Smith, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the
same theory" to the state court). This rule has been interpreted by the Supreme Court as one of
total exhaustion, Rose v. Lundy, 455 U.S. 509 (1982), meaning that each and every claim set forth
in the federal habeas corpus petition must have been presented to the state appellate court. Picard
v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987)
(exhaustion "generally entails fairly presenting the legal and factual substance of every claim to
all levels of state court review"). Moreover, the substance of the claim must have been presented
as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v.
Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the
procedural default doctrine). If the state court decides a claim on an independent and adequate
state ground, such as a procedural rule prohibiting the state court from reaching the merits of the
constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review.
Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315
(2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of
the state court rests on a state law ground that is independent of the federal question and adequate

to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim or state law deems the claim waived),[1] then the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Id. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." Coleman, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." Id. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)); see also Ambrose v. Booker, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to

---

[1] The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. Id. § 40-30-106(g).

establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (2004) (citing Murray v. Carrier, 477 U.S. 478, 495–96 (1986)); accord Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006).

## V. ANALYSIS

As recited above, the Petition asserts four claims: two based on the State's evidence at trial and two based on the performance of Petitioner's attorney at trial or on appeal. Upon considering the arguments of the parties and the record of state court proceedings, the Court finds no grounds for awarding habeas relief on any of Petitioner's claims.

### A. Admission of Video Deposition

The first claim of the Petition is that the trial court's admission of William Brockette's video deposition violated Petitioner's constitutional right to confront the witnesses against him at trial. Petitioner exhausted this claim by raising it on direct appeal. Noting that the State had conceded the violation, the Tennessee Court of Criminal Appeals agreed that Petitioner's Sixth Amendment Confrontation Clause rights were violated in this instance. The appellate court found that Mr. Brockette's deposition testimony was improperly admitted because his unavailability to testify in person had not been established, and that it was clearly damaging to Petitioner's defense that the killings were not premeditated. State v. Clark, 2013 WL 6145812, at *10. Specifically,

Mr. Brockette testified that Petitioner told him the night before the killings that "if that fence was still up when he got off work that morning and went home, [then] he was going to kill [his brother, Roy]," and that Petitioner expressed resentment that his mother had "always taken up for Roy" and made excuses for his poor behavior. Id. at *2; (Doc. No. 14-2 at 13; Doc. No. 14-5 at 37–40). However, the appellate court found that the violation was harmless beyond a reasonable doubt because the evidence of premeditation was "overwhelming" and outcome-determinative even in the absence of Mr. Brockette's deposition testimony. Id. at *8–10. Petitioner asserts that the violation of his Confrontation Clause rights was not harmless, and that the decision of the Court of Criminal Appeals was contrary to, or involved an unreasonable application of, clearly established Supreme Court authority. (Doc. No. 27 at 40–41).

A violation of the Confrontation Clause may be subject to harmless-error analysis, McCarley v. Kelly, 801 F.3d 652, 665–66 (6th Cir. 2015) (citing Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)), if the state court is able to declare it "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). A state court's declaration of harmless constitutional error is an adjudication on the merits of the constitutional claim and is subject to federal habeas review under the standard announced in Brecht v. Abrahamson, 507 U.S. 619 (1993), which "subsumes the limitations imposed by AEDPA." Davis v. Ayala, 576 U.S. 257, 269–70 (2015). "Brecht requires a Confrontation Clause violation to have a 'substantial and injurious effect or influence in determining the jury's verdict' before it merits reversal on collateral review." McCarley, 801 F.3d at 665 (quoting Brecht, 507 U.S. at 637). Accordingly, this Court must determine whether the violation substantially influenced the jury's decision, or whether the Court at least has grave doubt on that score, id., such that the state court's "harmlessness

determination itself was unreasonable." Davis, 576 U.S. at 269 (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)).

Petitioner argues that the State "stressed how [Brockette's] testimony was the crux of their case regarding premeditation . . . as they argued in their opening and closing argument to the jury," and claims that there was no other evidence in the record to support a finding beyond a reasonable doubt that the murders were premeditated. (Doc. No. 27 at 40). He further challenges the failure of the Court of Criminal Appeals to follow the five-prong test for harmless constitutional error set out by the United States Supreme Court in Van Arsdall, arguing that this failure resulted in a decision that was contrary to clearly established federal law. (Doc. No. 27 at 38–41).

It is true that the Supreme Court stated in Van Arsdall, 475 U.S. at 684, that a "host of factors" may inform the determination on direct appellate review of whether a constitutional violation at trial is harmless beyond a reasonable doubt under Chapman v. California, including the five factors cited by Petitioner.[2] However, the Supreme Court subsequently clarified in Brecht that *collateral* review of a state court's harmless-error determination does not consider whether the state court properly applied such factors, but whether the habeas petitioner was actually prejudiced—that is, whether the constitutional violation had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. 619, 637–38 (quoting Kotteakos v. United States, 328 U.S. 750 (1946)) ("Overturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under Chapman undermines the States' interest in finality and infringes upon their sovereignty over criminal matters. . . . [W]e hold that the Kotteakos harmless-error standard applies in determining whether

---

[2] "These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684 (citing cases).

habeas relief must be granted because of constitutional error of the trial type."). If the verdict was so influenced by the constitutional violation, the state court's harmlessness determination is unreasonable, and the deference owed that determination under AEDPA is overcome. See Fry, 551 U.S. 112, 119–20 (finding that the Brecht standard of "actual prejudice" subsumes "the more liberal AEDPA/Chapman standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable"). "In order to determine whether an error had such an effect or influence, the Supreme Court has instructed the lower federal courts to ask directly, 'Do I, the judge, think that the error substantially influenced the jury's decision?'" McCarley, 801 F.3d at 665 (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)).

Here, assuming that Brockette's deposition testimony was erroneously admitted into evidence in violation of Petitioner's Confrontation Clause rights, it cannot be said that that testimony had a substantial and injurious effect or influence upon the jury's verdict. Rather, the Court of Criminal Appeals reasonably determined that the erroneous admission was harmless beyond a reasonable doubt because the remainder of the evidence at trial overwhelmingly showed that Petitioner premeditated the killings of his mother and brother. This evidence is discussed below in resolving Petitioner's related claim that the evidence was insufficient to support the jury's finding of premeditation. The evidence of premeditation was also alluded to in closing arguments, where the State did not exclusively rely upon Brockette's testimony to establish that element as Petitioner claims, but made the following contentions:

> Also you can consider the fact, ladies and gentlemen, that it was a premeditated murder of Vida Clark. If you'll remember the two things that I told you we would come back to in this trial, the 9-1-1 call and Dr. Deering's testimony, the first piece of evidence and the last piece of evidence. We know that Vida Clark was alive at 6:27 when she made that phone call. There's no question about that. We know she was shot in her arm, and we know that she said, "My son next door is outside shooting in the house." And when you listen to that 9-1-1 call, I challenge you to listen to it very carefully, and when you're listening to it, you're going to hear some

gunshots on that 9-1-1 call, we know that Kevin Clark calls his wife at 6:35 and says, "It's done. I've taken care of things. I've called the police and the fire department." And we know from Dr. Deering that Ms. Clark's fatal wound was a gunshot wound, a shotgun blast to the back of her head. So, in between 6:27 and the time that Vida Clark died, or received that fatal gunshot wound, Kevin Clark had time to reflect and think about what he was going to do. He had already set his plan in action. There was no turning back. He had no intent to turn back. He knew exactly what he was going to do. He was going to finish his brother off, he was going to finish his mother off. . . . And, again, ladies and gentlemen, when you get that shotgun out of your house, from wherever it was at, and you load that shotgun with those shells, five of them, those are all intentional acts, and each one of those shells that you put in there, you've got time – he had time to think about what he was doing. He didn't stop. . . . Was it premeditated? Well, what did he tell William Brockette, his co-worker? "If I go home tomorrow and that fence is up, I'm going over there and killing him." And that's precisely what he d[id], he went over and killed his brother, without hesitation. And what did he tell – what did he tell his other brother, Jerry Clark? You heard him testify. He called his brother the night before and said, "Did you know about this fence?" "No, I didn't." And he talked about getting an attorney. What did he tell Jerry Clark[,] he told him, "I'll take care of it." And the next morning, he did.

(Doc. No. 14-8 at 33–35). As further discussed below, the evidence of premeditation at trial was such that the Court of Criminal Appeals' harmlessness determination was reasonable.

B. Sufficiency of the Evidence of Premeditation

In a separate but related claim, Petitioner challenges the sufficiency of the evidence supporting his first-degree murder convictions. He "does not dispute his guilt of the murders, but only . . . the premeditation [of] the murders." (Doc. No. 27 at 22). Specifically, he argues that the evidence does not support the jury's finding on the element of premeditation "because there is substantial evidence of provocation[,] that he acted in the 'heat of passion' when he committed the killings" (id. at 51), and thus was not "sufficiently free from excitement and passion as to be capable of premeditation." (Id. at 49 (quoting Tenn. Code Ann. § 39-13-202(d)). Petitioner exhausted this claim by raising it on direct appeal.

The Tennessee Court of Criminal Appeals properly stated the applicable standard for adjudicating the sufficiency of the convicting evidence as "whether, after reviewing the evidence

23

in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Clark, 2013 WL 6145812, at *11 (citing, e.g., Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In accord with this standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Cavazos v. Smith, 565 U.S. 1, 6 (2011) (quoting Jackson, 443 U.S. at 326)). Thus, a federal habeas court must resist substituting its own opinion for that of the convicting jury, York v. Tate, 858 F.2d 322, 329 (6th Cir. 1988), particularly when it comes to matters of witness credibility, which "is an issue to be left solely within the province of the jury." Knighton v. Mills, No. 3:07-cv-2, 2011 WL 3843696, at *6 (E.D. Tenn. Aug. 29, 2011) (citing, e.g., Deel v. Jago, 967 F.2d 1079, 1086 (6th Cir. 1992)).

In addition to this requirement of deference to the jury verdict concerning the substantive elements of the crime under state law, this Court must defer to the state appellate court's consideration of that verdict under AEDPA. See Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008) (stating that "the law commands deference at two levels" when adjudicating sufficiency-of-the-evidence claim). Here, the Court of Criminal Appeals gave the following description of the statutory elements under consideration and the parameters for considering the sufficiency of their proof:

> As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39–13–202(a)(1) (2006).

> As used in the statute,

>> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in

order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39–13–202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." State v. Gann, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. See, e.g., State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Coulter, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." Bland, 958 S.W.2d at 660.

State v. Clark, 2013 WL 6145812, at *12. The Court of Criminal Appeals then considered the

sufficiency of the proof in Petitioner's case, as follows:

In this case, the evidence established that [Petitioner], angry about the construction of a fence across the driveway to his house, told Mr. Brockette that he would kill his mother and brother if the fence remained when he finished work. When [Petitioner] returned home, he outfitted himself in a field jacket and boots and armed himself with a 12-gauge shotgun and a .22-caliber rifle. He then went to the house his mother, Vida Clark, shared with his brother, Roy Clark, where he gained entry by firing the shotgun at the doorknob. Once inside, he shot Roy Clark once from behind, inflicting a fatal wound to Roy Clark's abdomen. He then shot Vida Clark once in the arm and then a second time in the back of the neck. At some point, [Petitioner] used gasoline to set fire to Vida Clark's house. After killing the victims and setting the house ablaze, [Petitioner] returned to his home, where he telephoned his wife to say that he had taken care of the issue with the fence and that authorities would never "take him alive." When police arrived, [Petitioner] fired upon them from his position inside his residence. After a period of negotiation, [Petitioner] surrendered to police. [Petitioner's] planning, use of a weapon on the unarmed victims, and calmness after the killings all support a finding that he premeditated the murders of Vida and Roy Clark. As such, the evidence was sufficient to support his convictions of first degree premeditated murder.

Id.

This Court has reviewed the transcript of Petitioner's trial and finds that the decision of the

Court of Criminal Appeals is well-supported in the record. There is ample evidence from which a

rational juror could find that Petitioner's killing of Vida and Roy Clark was intentional and premeditated, not least of which is the amount of time that passed between Petitioner becoming aware of the fence across his driveway and his actions in arming himself and carrying out a deadly attack on the family members with whom he was feuding. Petitioner argues that the evidence demonstrates that he was provoked to anger by the initial placement of the fence across his driveway, and that "his anger continued to boil" until "[o]n the date of the crimes, something snapped in him" when the fence remained in place. (Doc. No. 27 at 54). He attacks the evidence of premeditation by arguing that the State failed to show that he planned the killings, or that he was able to calmly reflect on his actions due to the "heat of passion" that had enveloped him. (Id. at 50–53). But "not all forms of passion possessed at the time of a homicide prevent premeditation"; if the evidence supports the finding that "an appreciable amount of time" was spent weighing the decision to kill prior to the actual commission of the crime, "it is immaterial that the act was carried out in a state of passion." State v. Jesperson, 1993 WL 305781, at *7 (Tenn. Crim. App. Aug. 11, 1993) (citing, e.g., Leonard v. State, 155 Tenn. 325, 292 S.W. 849, 852–53 (Tenn. 1927)).

Even disregarding Mr. Brockette's deposition testimony, Jerry Clark testified that Petitioner was upset about the placement of the fence when he called the night before the killings, and that he rejected Jerry's advice to demonstrate his legal right to use the driveway, stating instead that he would "take care of it [him]self." (Doc. No. 14-5 at 53–54). Susan Clark testified that the following morning—*after* Petitioner had returned home to find the fence still in place—he told her that he would be mowing a neighbor's yard before it rained and so would be unable to deal with the driveway issue that morning; she testified that "he was fine" at that time, which was just before she left for work and roughly an hour before their next conversation, during which Petitioner

26

reported that the problem had been taken care of and that the authorities would not "take [him] alive." (Id. at 71–73). This testimony, in combination with the physical evidence of Petitioner's preparation to commit the crimes (including, as the Court of Criminal Appeals noted, "outfit[ing] himself in a field jacket and boots and arm[ing] himself with a 12-gauge shotgun and a .22-caliber rifle") is clearly sufficient to enable a rational trier of fact to find the essential element of premeditation beyond a reasonable doubt.

Petitioner further argues that he was exposed to "legally sufficient provocation" to support a lesser degree of homicide. (Doc. No. 27 at 54–57). But "[n]ot every provocation will reduce killing to manslaughter, for the resentment must bear a reasonable proportionality to the provocation." Jesperson, 1993 WL 305781, at *7 (citing Rader v. State, 73 Tenn. 610, 620 (Tenn. 1880)). The jury in Petitioner's case clearly did not believe that a fence was placed across his driveway, or that the fence remained in place one day later, was sufficient provocation to justify the killings as a proportionate response, and the evidence at trial was sufficient to support that finding.

In sum, the evidence was sufficient to support the jury's verdict that these killings were not the result of a sudden moment of passion that belies premeditation, but were sufficiently considered to justify Petitioner's conviction of first-degree murder. The evidence was likewise sufficient to support the determination that Mr. Brockette's deposition testimony did not substantially influence the jury's verdict but was harmless beyond a reasonable doubt in light of the great weight of the other evidence of premeditation. The Tennessee Court of Criminal Appeals reasonably reached both conclusions. Accordingly, Petitioner is not entitled to habeas relief on either of his first two claims.

C. <u>Ineffective Assistance of Counsel</u>

Petitioner claims that his Sixth Amendment right to the effective assistance of counsel was violated at trial and on direct appeal. Federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. <u>Id.</u> at 687. To meet the first prong, Petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" <u>Id.</u> at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993). Prejudice, under <u>Strickland</u>, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

Petitioner's first ineffective-assistance claim (the third claim of the Petition) asserts trial counsel's ineffectiveness for failing to pursue evidence that the killings were not premeditated, particularly by failing to question Petitioner's ex-wife about a recent change in his work schedule, as well as his recent mental health treatment with medication and changes in his behavior. (Doc. No. 1 at 12–15.) He alleges that "Susan Clark communicated this information to counsel and stated that she would have testified at trial regarding these facts, but counsel never asked her anything about the change in Petitioner's work schedule, the medication that he was taking, that the

28

medication was for panic and depression anxiety disorder, and that it led to the change in his behavior, that is, suppressed anger, rage, and sudden resentment, that eventually caused him to snap." (Doc. No. 1 at 15.) Petitioner raised this claim before the post-conviction trial court, as part of a larger claim of ineffective assistance for failing to present proof to support the defense theory of diminished capacity or lack of criminal responsibility. (Doc. No. 14-20 at 25–33.) The post-conviction trial court denied this claim on its merits after hearing testimony from both Ms. Clark and trial counsel. (Doc. No. 14-21 at 45, 48–49.) However, Petitioner's post-conviction counsel did not raise this claim on post-conviction appeal. (See Doc. No. 14-24.) Accordingly, Respondent argues that this ineffective assistance claim has been procedurally defaulted. (Doc. No. 16 at 24.)

Petitioner does not dispute that he defaulted this claim but attempts to excuse the default by reference to (1) the ineffective assistance of his post-conviction appellate counsel, and (2) his actual innocence of first-degree, premeditated murder because of his mental state at the time of the killings. The Court addressed these attempts to excuse Petitioner's procedural default in a prior ruling on his motion to expand the record. (Doc. No. 25, entered Feb. 14, 2020). In its prior ruling, the Court first found that Supreme Court and Sixth Circuit precedent categorically precludes reliance upon counsel's ineffectiveness on post-conviction appeal—as opposed to ineffectiveness during "initial-review collateral proceedings"—to excuse the default of an ineffective-assistance-of-trial-counsel claim. (Id. at 3–5 & n.1 (quoting Martinez v. Ryan, 566 U.S. 1, 9 (2012), and West v. Carpenter, 790 F.3d 693, 698–99 (6th Cir. 2015)). Next, after acknowledging that procedural default could be excused by a showing of actual innocence of the underlying offense (id. at 7 (citing Dretke v. Haley, 541 U.S. 386, 388 (2004), and Schlup v. Delo, 513 U.S. 298, 324 (1995)), the Court rejected Petitioner's actual-innocence claim, relying upon the following authority:

> The Sixth Circuit recognizes that arguments going to legal innocence, as opposed to factual innocence, do not support review of defaulted claims through the actual

innocence exception. Harvey v. Jones, 179 F. App'x 294, 298–99 (6th Cir. 2006) (citing, e.g., Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000) (rejecting as arguments going to legal innocence petitioner's claim that he was not guilty of first-degree murder because he was intoxicated and acted in self-defense)). "The relevant case authority solidly supports the . . . view that in this circuit a habeas petitioner may not show his 'actual innocence' under Schlup by presenting new evidence that might have led a jury to convict him of a lesser offense," as such evidence would only demonstrate legal rather than factual innocence. Wolfe v. Westbrooks, No. 3:14-cv-1575, 2019 WL 1242701, at *2 (M.D. Tenn. Mar. 18, 2019) (citing Harvey, 179 F. App'x at 298). In Robinson v. Morrow, the court cited several cases that addressed actual-innocence arguments based on "new evidence show[ing] [the petitioner] is guilty only of a lesser degree of homicide," recognized that such evidence does not demonstrate factual innocence, and "conclude[d] that by asserting that he is guilty of something less than premeditated first-degree murder, Petitioner has failed to satisfy the standard for gateway actual innocence." Robinson, No. 3:08-cv-00235, 2015 WL 5773422, at *18–20 (M.D. Tenn. Sept. 30, 2015). See also Artz v. Burton, No. 5:06–cv–10238, 2014 WL 3440078, at *18–19 (E.D. Mich. Feb.18, 2014) report and recommendation adopted, No. 06–10238, 2014 WL 3451410 (E.D. Mich. July 15, 2014) ("Nor can petitioner establish actual innocence on the basis that Dr. Galdi's opinion that he suffered from marijuana psychosis renders him actually innocent of first degree murder, and guilty of only second degree murder, because it would negate the specific intent elements of first degree murder. This is not the type of evidence of factual innocence that would render it a miscarriage of justice to fail to address petitioner's procedurally barred claims on the merits.").

. . . Because Petitioner does not identify new evidence which would show his factual innocence of the homicide charges, but only evidence that would potentially support a claim of legal innocence of first-degree, premeditated murder, he cannot use the Schlup gateway to reach the merits of his defaulted ineffective assistance claim . . . .

(Doc. No. 25 at 7–9).

Having failed to demonstrate cause excusing the procedural default of his ineffective-assistance-of-trial-counsel claim, Petitioner is not entitled to review of the merits of that claim in this Court.

In the fourth and final claim of the Petition, Petitioner claims that his counsel was ineffective on direct appeal by failing to argue cumulative error by the trial court, and by inadequately briefing the issue of the sufficiency of the evidence. Respondent asserts that the

inadequate-briefing component of this claim was procedurally defaulted when it was not raised during post-conviction proceedings. (Doc. No. 16 at 25) (citing <u>Wong v. Money</u>, 142 F.3d 313, 322 (6th Cir. 1998) (stating that "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court")). While Petitioner asserts the ineffective assistance of his post-conviction counsel as cause for any such default (Doc. No. 27 at 58–60), the Supreme Court has held that the ineffective assistance of post-conviction counsel cannot excuse the default of a claim of ineffective assistance of *appellate* counsel, but only a claim of trial counsel's ineffectiveness in certain circumstances. <u>Davila v. Davis</u>, 137 S. Ct. 2058 (2017). Having failed to otherwise proffer any cause for the default of this claim of appellate counsel's ineffectiveness in briefing the sufficiency-of-the-evidence issue, Petitioner is not entitled to review of its merits in this Court.

Petitioner properly exhausted his claim that appellate counsel was ineffective in failing to argue the cumulative effect of trial court error. The Tennessee Court of Criminal Appeals denied post-conviction relief on this claim, as follows:

> We conclude that Counsel was not ineffective in his appeal of the Petitioner's case. Counsel preserved and presented several issues, and it was within his discretion to determine which issues to appeal. . . . As the court found (on direct appeal) that there was only one error, we further conclude that the Petitioner cannot show that he was prejudiced by Counsel's failure to appeal whether the cumulative effect of the errors entitled the Petitioner to relief. The Petitioner is not entitled to relief on this issue.

<u>Clark v. State</u>, 2018 WL 3045686, at *13.

As previously discussed, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable

31

determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. at 101. As the Supreme Court clarified in Harrington,

> This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Id. (internal quotation marks and citation omitted).

The Court of Criminal Appeals properly decided this issue under both prongs of the Strickland standard. First, the court determined that counsel's failure to include this particular issue alongside the others he deemed worthy of appellate consideration represents a proper exercise of counsel's professional judgment. See Montalvo v. Annetts, No. 02 CIV.1056 LAK AJP, 2003 WL 22962504, at *23 (S.D.N.Y. Dec. 17, 2003) (stating that appellate counsel "may select from among [nonfrivolous issues] in order to maximize the likelihood of success on appeal," and "[r]eviewing courts should not second guess the reasonable professional judgments of appellate counsel as to the most promising appeal issues") (quoting Smith v. Robbins, 528 U.S. 259, 288 (2000)). Next, the Court of Criminal Appeals found that Petitioner was not prejudiced by the absence of this issue from his appeal, because a claim of cumulative error cannot get off the ground unless more than one trial-court error is demonstrated, and Petitioner could not point to more than one trial error.

Under Tennessee law, "[t]he cumulative error doctrine embodies the idea that a multiplicity of errors—though individually harmless—may in the aggregate violate a defendant's due process right to a fair trial." State v. Clark, 452 S.W.3d 268, 299 (Tenn. 2014). Thus, for the doctrine to apply, "there must have been more than one actual error committed in the trial proceedings." State v. Herron, 461 S.W.3d 890, 910 (Tenn. 2015) (quoting State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010)).

The Court of Criminal Appeals reasonably applied Strickland to find that counsel did not perform deficiently on appeal, and even if he did, that only one error was committed during Petitioner's trial—the erroneous use of the Brockette deposition testimony—means that Petitioner could not have been prejudiced by the failure to raise cumulative error as an issue on appeal. Petitioner is not entitled to habeas relief on this claim, or to further review of any of his ineffective-assistance claims.

## VI. CONCLUSION

For all these reasons, the Petition for Writ of Habeas Corpus will be denied and this matter will be dismissed with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336

(2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. Id. at 337.

Because reasonable jurists could not debate whether the Petitioner's claims should have been resolved differently or deserve encouragement to proceed further, the Court will deny a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE